**Raymond Dale LIGGINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–97–247–CR.**

Court of Appeals of Texas, Waco.

Oct. 28, 1998.

Thomas D. Whitworth, Law Offices of Thomas D. Whitworth, Rita K. Papajohn, Cleburne, for appellant.

Dale S. Hanna, District Attorney, David W. Vernon, Asst. District Attorney, Cleburne, for appellee.

Before Chief Justice DAVIS, Justice CUMMINGS and Justice VANCE.

## OPINION

DAVIS, Chief Justice.

A jury convicted Raymond Dale Liggins of delivery of cocaine in the amount of one gram or more but less than four grams. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(c) (Vernon Supp.1998). The jury found that Liggins had been previously convicted of forgery and sentenced him to twenty years' imprisonment and no fine.

Liggins presents twelve points of error on appeal. His points relate to the jury's implied finding that he was not entrapped; the alleged outrageousness of the undercover officers' conduct in persuading him to sell them cocaine; the court's admission of allegedly "speculative and prejudicial opinion testimony"; the jury's viewing of a videotape during deliberations; the admissibility of certain prior misdemeanor convictions offered in the punishment stage of his trial; and the State's argument concerning those prior misdemeanor convictions. We will affirm the judgment.

## FACTUAL BACKGROUND

Liggins' indictment originally alleged three counts of delivery of cocaine on or about April 8, April 9, and April 15, 1996 respectively. The State elected to proceed to trial on only the April 9 allegation. The record reflects that Alan Cartwright, an investigator with the S.T.O.P. Narcotics Task Force, enlisted Liggins' cousin Johnny Shipman as a confidential informant to aid in locating drug dealers and arranging sales to undercover officers.[1] Cartwright testified that he had targeted a suspected dealer for an undercover purchase on April 8, but the suspect would

not deal with him.[2] When this deal did not materialize, Shipman directed Cartwright to Liggins' residence.

Cartwright testified that Liggins appeared to be engaged in a drug transaction as they approached. Cartwright told Liggins he wanted to purchase five rocks of crack cocaine. Liggins went and talked with a man sitting on the front porch of his home. He then took Cartwright's money to the man on the porch and obtained the cocaine in return. He delivered the cocaine to Cartwright.

Cartwright returned on April 9 with another undercover officer. He asked Liggins for sixteen rocks on this occasion. Liggins got in Cartwright's truck and directed him to a neighborhood park. Liggins approached a man in the park about the proposed deal. He then returned to the truck for Cartwright's money. He took the money, exchanged it for fifteen rocks, and delivered the cocaine to Cartwright. Cartwright noted the shortage, and Liggins went back to question the man in the park about it. He shortly returned to report that the man had no more rocks to sell. The officers returned Liggins to his home.

Two or three days later, the officers returned to Liggins' home in an attempt to allay any concerns that they were actually law enforcement officials. They brought beer and applications for employment with a purported fencing company in Fort Worth for which they claimed to work. They stayed for a brief social visit and encouraged Liggins to give applications to any of his friends or acquaintances who might be looking for work. They did not seek to purchase any cocaine during this visit.

On April 15 the officers returned for another purchase. According to the officers, Liggins introduced them to a man from whom they could purchase cocaine. According to Liggins, this man just happened to drive by at the time the officers arrived, and

---

1. According to the record, the S.T.O.P. Narcotics Task Force is a multi-jurisdictional narcotics task force which operates in Johnson, Hood, and Somervell Counties.

2. Cartwright initially testified on direct examination about the April 9 transaction which was the

one for which the State sought a conviction. Liggins' counsel elicited information about the April 8 and April 15 transactions during cross examination. The State offered further evidence regarding these extraneous transactions during redirect.

the officers dealt directly with him. Liggins rode with the other man, and the parties met at the park. The officers negotiated directly with the other man for the purchase of cocaine. After the transaction was consummated, the seller left. The officers gave Liggins a ride back to his house.

According to Liggins, Shipman told him about Cartwright several weeks before they actually met. Liggins testified that Shipman told him Cartwright would offer him a job with a fencing company. He recalled that on April 8 Shipman approached him and introduced Cartwright to him as the man he had previously told him about who could give him a job. Liggins told the jury that he only arranged the drug transactions because he understood that the officers would give him a good-paying job with their fencing company if he could provide the cocaine they needed. This formed the basis of Liggins' entrapment defense. Shipman's and the officers' versions of these conversations varied significantly from Liggins.' The jury rejected the entrapment defense; found Liggins guilty; and sentenced him as indicated above.

## ENTRAPMENT

■ Liggins' first point asserts that the evidence establishes entrapment as a matter of law. His second and third points respectively challenge the legal and factual sufficiency of the evidence to support the jury's rejection of his entrapment defense.

The State responds that defenses such as entrapment are not subject to a factual sufficiency challenge. However, this Court has already determined that the entrapment defense is subject to a factual sufficiency challenge. *See Hernandez v. State*, 938 S.W.2d 503, 509–10 & n. 11 (Tex.App.—Waco 1997, pet. ref'd). Other courts have considered factual sufficiency challenges in cases where juries rejected self-defense, which carries the same procedural consequences as entrapment under section 2.03 of the Penal Code.[3] *See Juarez v. State*, 961 S.W.2d 378, 385 (Tex.App.—Houston [1st Dist.] 1997, pet. ref'd); *Jones v. State*, 951 S.W.2d 522, 526–27

(Tex.App.—Beaumont 1997, pet. ref'd); *Ojeda v. State*, 945 S.W.2d 197, 200–01 (Tex. App.—San Antonio 1997, no pet.). We will follow these authorities and analyze the factual sufficiency of the evidence to support the verdict.

### APPLICABLE LAW

■ To raise entrapment, an accused must produce evidence that: (1) he was actually induced to commit the offense; and (2) the inducement "was such as to cause an ordinarily lawabiding person of average resistance nevertheless to commit the offense." *England v. State*, 887 S.W.2d 902, 913–14 (Tex.Crim.App.1994). Once the accused has presented such evidence, the State must disprove the defense beyond a reasonable doubt. *Hernandez*, 938 S.W.2d at 510; *accord Saxton v. State*, 804 S.W.2d 910, 913 (Tex.Crim.App.1991).

### Matter of Law

■ Entrapment is generally a question for the jury unless the accused establishes the defense as a matter of law. *Melton v. State*, 713 S.W.2d 107, 113 (Tex.Crim.App. 1986); *Redman v. State*, 533 S.W.2d 29, 31 (Tex.Crim.App.1976). This is nothing more than a recognition that the accused is entitled to an instructed verdict of acquittal if the State fails to disprove his defense beyond a reasonable doubt. *See Riley v. State*, 953 S.W.2d 354, 357–59 (Tex.App.—Austin 1997, pet. ref'd) (holding promiscuity defense not established as a matter of law); *cf. Harris v. State*, 790 S.W.2d 778, 779–80 (Tex.App.— Houston [14th Dist.] 1990, pet. ref'd) (reversing judgment and directing entry of acquittal order where State failed to introduce any evidence to prove an element of offense).

■ We treat a motion for an instructed verdict as a challenge to the legal sufficiency of the evidence. *Cook v. State*, 858 S.W.2d 467, 470 (Tex.Crim.App.1993). Thus, we will consider Liggins' first point concerning his assertion that he established entrapment as a matter of law together with his second point

---

**3.** Entrapment and self-defense are both defenses to prosecution. *See* TEX. PEN.CODE ANN §§ 8.06(a), 9.02, 9.31(a) (Vernon 1994). As such, both have the procedural consequences provided by section 2.03 of the Penal Code. *Id.* § 2.03 (Vernon 1994).

challenging the legal sufficiency of the evidence to support the jury's rejection of his entrapment defense.

## Legal Sufficiency

A challenge to the legal sufficiency of the evidence supporting a verdict which has implicitly rejected a defense requires us to view the evidence in the light most favorable to the implicit rejection of the defense. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim.App.1992). We resolve any inconsistencies in the evidence in favor of the verdict. *Id.* at 423; *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991).

## Factual Sufficiency

When presented with a factual insufficiency claim, we discard the prism of the light most favorable to the verdict. *Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). We reverse "only if [the implicit rejection of the defense] is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.*; *Hernandez*, 938 S.W.2d at 512.

We consider all the evidence in the record related to the contested issue, "not just the evidence which supports the verdict." *Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997). We review the evidence tending to prove the issue, "and compare[ ] it to the evidence which tends to disprove that [issue]." *Id.* We give appropriate deference to the jury's decision and do not substitute our judgment for theirs. *Clewis*, 922 S.W.2d at 135; *Hernandez*, 938 S.W.2d at 512. We do not set aside the "verdict merely because [we] feel that a different result is more reasonable." *Clewis*, 922 S.W.2d at 135 (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986)).

### Pertinent Facts

Cartwright testified that Shipman directed him to Liggins' home on April 8 because the initially targeted suspect would not deal with him. Shipman told Cartwright he could probably get some cocaine from Liggins. As they approached, Cartwright observed Liggins apparently selling drugs to another person. He told Liggins he needed five rocks of crack cocaine. Liggins took Cartwright's money, exchanged it with another man sitting on the front porch of his house for the requested cocaine, and delivered the rocks to Cartwright. He asked Cartwright for one of the rocks which he had just delivered. Cartwright explained that this is a typical manner in which "middlemen" collect a "brokerage fee." Cartwright would not give Liggins a rock but permitted him to keep ten dollars as his fee. Liggins responded affirmatively when Cartwright asked if he would be there the next day at about the same time. Cartwright denied mentioning a job or making any job offers to Liggins on April 8.[4]

Cartwright returned the next day with another officer. He told Liggins that he wanted to buy sixteen rocks on this occasion. Liggins got in Cartwright's truck and directed him to drive to a neighborhood park. At the park, Liggins left the truck and went to talk with a person playing basketball. He promptly returned to get Cartwright's money. He took Cartwright's money, exchanged it with the person in the park for the requested cocaine, and delivered the rocks to Cartwright. Liggins again requested a rock. Cartwright did not give him a rock but permitted him to keep ten dollars. Cartwright then returned Liggins to his house. He denied discussing a job with Liggins on this occasion as well.

Cartwright explained that he and the other officer returned two or three days later for a social visit because some of Liggins' friends suspected that they were undercover officers. They brought beer and job applications with them. According to Cartwright, they used this opportunity to explain that they worked for a fencing company and to distribute generic employment applications to Liggins and his acquaintances. He explained that they hoped to identify other acquaintances of Liggins who might be selling drugs. If any returned completed applications, they intended to take a photograph to assist in identification under the guise that their company

---

**4.** Cartwright also denied ever discussing "job offers" with Shipman, whom Liggins testified had initially told him about a possible job several weeks before the April 8 meeting.

required a photograph to accompany job applications. Cartwright testified that even though he did not mention drugs on this occasion, Liggins offered to sell some to him.

Cartwright told the jury that Liggins introduced him to another dealer on April 15 who drove up to Liggins house. He told Liggins he needed a larger quantity of cocaine on this occasion. Liggins and the other man left in the other's car, and Cartwright and his fellow undercover officer met them at the park thereafter. Cartwright negotiated the deal with the other man and purchased cocaine directly from him. Liggins got in Cartwright's truck, and Cartwright drove him home. Cartwright gave Liggins twenty dollars for this deal.

On the way home, Liggins told the officers he had completed his job application. When they asked about obtaining even more cocaine, he told them he knew a supplier in Fort Worth who could provide what they needed. When they arrived at Liggins' house, they waited as he went inside to get the application. According to Cartwright, they waited five or ten minutes. He did not recall Liggins ever returning with an application.

The officer who accompanied Cartwright on April 9, during the social visit, and on April 15 confirmed Cartwright's recollection of the pertinent events. He testified that Liggins helped them obtain the requested rocks without any hesitation. He agreed that neither Cartwright nor he discussed any possible job with Liggins until the social visit.

Liggins testified that he saw Shipman at their grandmother's house in mid-March. On this occasion, Shipman told him of a person with a fencing company who had a job for him that paid seven dollars an hour. According to Liggins, Shipman introduced Cartwright to him on April 8 as the person with the job opportunity. Liggins admitted that he provided Cartwright the drugs on April 8 and 9 substantially as Cartwright testified. He testified that Cartwright gave him a job application on April 9. He confirmed that some of his acquaintances were suspicious of Cartwright and that Cartwright paid a social call two or three days later. He agreed that Cartwright brought job applica-

tions when he came on this social visit. Liggins denied any involvement in the April 15 transaction. He claimed that he did not introduce Cartwright to the man from whom he purchased the drugs. He explained that Cartwright met the other man because they both happened to drive by Liggins' house at the same time. He testified that he rode with the other man to some location where the other person got the drugs he intended to sell and then to the park where they met back with Cartwright.

Liggins agreed that he had asked for a rock on the first two occasions and had accepted money on each of the three occasions when Cartwright purchased cocaine. He explained that he had a "drug habit" but his habit was not a "drug problem" because he did not steal things or commit other crimes to obtain whatever controlled substances he used. He admitted to the jury that he did on April 9 exactly what the State alleged but only because he desperately wanted a good-paying job to better provide for his young daughter. As Liggins put it:

> I know I was wrong for doing what I did, but that obligation to me was like putting a carrot in front of a mule. And I was willing to sacrifice that for the job, but I know'd it was wrong.

> I admit, you know to saying that I went over there and I got the dope from them for them. I admit to that. I can accept my punishment on that right there. But what ya'll are trying to say is that he get up in front of the jury, make me look like this big-time dope dealer. He's got all the crack in Cleburne, he's supplying all these people and all this, and that's wrong. And he knows it's wrong.

> Constructive delivery is what you can get me of, but ya'll got me delivery—I'm delivering straight to them, this is my own dope. That's what I want the jury to understand. And I was entrapped into this.

> But the way the situation is, you know, I take time, you know, for what I said, constructive delivery. But as far as you saying I'm all this big-time dope dealer, I'm

this and that, they nothing but lies and accusations.

Shipman denied ever speaking to Liggins about a potential job. His recollection of the details of the April 8 transaction varied significantly from both Cartwright's and Liggins' versions. Liggins' sister testified that she overheard Shipman telling Liggins of the potential job. She recalled that Shipman told Liggins he would have to put the potential employer in touch with someone else but nothing illegal was involved. Liggins' grandmother testified that he lived with her at the home where Cartwright and Shipman approached him. She had never seen any drug transactions taking place outside her home. She did not see Shipman around her home at any time during the months leading up to April 1996. She could not recall any specific job offer Liggins was contemplating.

### ANALYSIS

█ When the evidence is viewed in the light most favorable to the verdict, the testimony of Cartwright, Shipman, and the other undercover officer provided sufficient evidence from which the jury could conclude Liggins was not entrapped. Accordingly, the evidence is legally sufficient to support the verdict. *See Adelman,* 828 S.W.2d at 423. Therefore, we overrule Liggins' first and second points.

The testimony of Liggins and his sister created a fact issue on the entrapment defense. However, we must give due deference to the jury's assessment of the credibility of the witnesses and the weight to be given their testimony. *See Clewis,* 922 S.W.2d at 135; *Hernandez,* 938 S.W.2d at 512. From our review of the evidence, we cannot say that the verdict "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis,* 922 S.W.2d at 134; *Hernandez,* 938 S.W.2d at 512. Thus, we conclude that the evidence is factually sufficient to support the verdict. Accordingly, we overrule Liggins' third point.

### OUTRAGEOUS POLICE CONDUCT

█ Liggins contends in his fourth point that the officers' conduct in making the alleged job offer was so outrageous as to deny

him due process of law. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). In *Russell,* the defendant asserted an unsuccessful entrapment defense based on an undercover officer providing him a difficult-to-obtain chemical necessary for the manufacture of methamphetamine. He also claimed that his prosecution should be barred due to the outrageous nature of the officer's conduct because commission of the offense would not have been possible if the officer had not "supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels." *Id.* 411 U.S. at 431, 93 S.Ct. at 1642.

The Court reviewed the evidence and observed that the defendant possessed several bottles of the chemical which he had obtained from some source other than the undercover officer. The Court's comments suggest that even if the officer had been the sole source for the chemical, his conduct would not have been so outrageous as to require reversal of the conviction because possession of the substance in question was legal. The Court held:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed.... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)) (other citation omitted).

According to our research, Texas appellate courts have addressed the "outrageous conduct" defense on five occasions. *See Armendarez v. State,* 822 S.W.2d 321, 322 (Tex. App.—Fort Worth 1992, pet. ref'd); *Ramirez v. State,* 822 S.W.2d 240, 248 (Tex.App.—

Houston [1st Dist.] 1991, pet. ref'd); *Hubbard v. State*, 770 S.W.2d 31, 39–41 (Tex. App.—Dallas 1989, pet. ref'd); *Beck v. State*, 741 S.W.2d 516, 524 (Tex.App.—Corpus Christi 1987, pet. ref'd); *Satterwhite v. State*, 697 S.W.2d 774, 776 (Tex.App.—Corpus Christi 1985, pet. ref'd). In none of these cases has the police conduct been found to be so outrageous as to require reversal. As the Dallas court observed, "Although the boundaries of the outrageous conduct defense remain poorly defined, the subsequent cases have clearly limited it to instances of the rarest and most egregious government misconduct." *Hubbard*, 770 S.W.2d at 39.

Liggins' allegations of "outrageous conduct" rest on disputed facts. Even if the allegations were true, we cannot say they rise to the level of "egregious government misconduct" which violates due process. *Hubbard*, 770 S.W.2d at 39. Accordingly, we overrule Liggins' fourth point.

## OPINION TESTIMONY

■ Liggins contends in his fifth point that the court erred in admitting "speculative and prejudicial opinion testimony." Specifically, Liggins complains that Cartwright gave speculative and unfairly prejudicial testimony when he explained to the jury that "middlemen" who deliver narcotics in the way Liggins did are "typically" paid by the person from whom they purchase the drugs for delivery to the ultimate buyer.

A defendant cannot complain of the admission of evidence when "other evidence of substantially the same facts" is admitted without objection. *McGlothlin v. State*, 896 S.W.2d 183, 189 n. 9 (Tex.Crim.App.1995) (quoting *Nicholas v. State*, 502 S.W.2d 169, 174 (Tex.Crim.App.1973) (on rehearing)). On cross-examination of Cartwright, Liggins' counsel asserted that his client did not facilitate the drug purchases "for a monetary motive" and invited Cartwright to speculate that Liggins perhaps filled his order to help Shipman. Cartwright responded without objection that he felt Liggins was brokering the

deal for the seller and that he assumed the seller later paid Liggins for the deal.

During Cartwright's cross-examination, evidence of substantially the same facts as those of which Liggins now complains was admitted before the jury without objection. Accordingly, any error arising from the original admission of this evidence was rendered harmless. *Nicholas*, 502 S.W.2d at 174. Thus, we overrule Liggins' fifth point.

## VIDEOTAPE EVIDENCE

Liggins' sixth, seventh, and eleventh points complain about the manner in which the court permitted the jury to review a videotape exhibit during deliberations. His sixth point contends that the court erred in permitting the jury to view the exhibit in its entirety because only a portion of the video had been shown to the jury during trial and because he had objected to the remainder of the video prior to its admission in evidence. He argues in his seventh point that permitting the jury to view this objected-to portion of the exhibit denied him the opportunity to cross-examine the State's witnesses on the content of this portion of the video. His eleventh point avers that the court erred in permitting the jury to view the exhibit at all because it constitutes testimonial evidence and the jury had not indicated any dispute concerning the testimony contained in the video. *See* TEX.CODE CRIM. PROC. ANN. art. 36.28 (Vernon 1981). We address the eleventh point first because it goes to the propriety of the jury viewing the exhibit at all.

■ Article 36.25 provides that the trial court shall furnish to the jury any exhibits admitted in evidence upon request.[5] TEX.CODE CRIM. PROC. ANN. art. 36.25 (Vernon 1981). Compliance with the statute is mandatory. *Parker v. State*, 745 S.W.2d 934, 936 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd); *accord Lopez v. State*, 628 S.W.2d 82, 85 (Tex.Crim.App. [Panel Op.] 1982); *Weathered v. State*, 833 S.W.2d 341, 355–56 (Tex. App.—Beaumont 1992, pet. ref'd).

---

**5.** Every reference to an "article" in this opinion refers to an article of the Code of Criminal Pro-

cedure unless otherwise indicated.

Conversely, article 36.28 allows the jury to rehear any portion of a witness' testimony concerning which the jurors disagree. TEX. CODE CRIM. PROC. ANN. art. 36.28. Liggins argues that the exhibit in issue falls within the ambit of article 36.28 because it is a recording of statements made by the parties to the April 8 transaction. According to our research however, at least three appellate courts have rejected Liggins' interpretation of the statute. *See Weatherred*, 833 S.W.2d at 355–56; *Parker*, 745 S.W.2d at 936; *Chennault v. State*, 667 S.W.2d 299, 302 (Tex. App.—Dallas 1984, pet. ref'd).

Liggins asks us to adopt the reasoning of the dissent in *Parker*. *Parker*, 745 S.W.2d at 938–39 (Smith, J., dissenting). In *Parker*, the jury requested to review a videotape which had been admitted in evidence. The trial court essentially instructed the jury that it could not review the evidence unless a dispute existed about the contents of the exhibit. Apparently, the jury decided not to view the exhibit. *Id.* at 936.

The *Parker* majority determined that article 36.28 only applies to the testimony of witnesses who appear in court and not to physical exhibits admitted in evidence. *Id.* Justice Smith dissented, concluding that the jury should not be permitted to view videotape evidence during deliberations unless the jury first certifies that it has a dispute about specific portions of the exhibit. *Id.* at 938. We are more persuaded by the reasoning of the majority.

■ Although a recording undoubtedly contains statements of persons who may ultimately be witnesses at trial, such statements are essentially declarations of those persons' perceptions as they existed at the time of the occurrence being recorded. They are not statements under oath made before a finder of fact. Since they are not, they should not be considered testimonial in nature.

Both sides agree that article 36.28 applies only to testimonial evidence. Because the videotape in question is not testimonial, the requirements of article 36.25 (rather than article 36.28) apply. *See Weatherred*, 833 S.W.2d at 355–56; *Parker*, 745 S.W.2d at 936; *Chennault*, 667 S.W.2d at 302. Accordingly, the court acted appropriately in allow-ing the jury to view the exhibit even though the jurors did not indicate any disagreement about its contents. Thus, we overrule Liggins' eleventh point.

■ The exhibit in dispute is the video-taped recording of the April 8 transaction between Liggins, Shipman, and Cartwright. The portion of the videotape in dispute is as follows:

Here Alan Cartwright returned to the S.T.O.P. Task Force office. I want to make mention that the time on the video-tape showed to be 1600 hours, which indicates 4:00 P.M. Daylight Savings Time changed on Sunday, April the 7th, and today is April the 8th, and we did not change our clock, so the correct time on the tape should be 1700 hours, which would be 5:00 P.M.

And now that we got that out of the way, here is the five dime rocks of crack cocaine that I bought from Raymond. Can you see those? I gave $50 for that. Raymond wanted to take one of them for setting up—or a piece of one for setting up the transaction, so I gave him a $10 tip. So that was $60 in U.S. currency that I paid for the crack cocaine, and it was S.T.O.P. Task Force funding.

Now, I will try to go back tomorrow, which is April the 9th. Try to make another purchase from Raymond. And that's all for now.

This portion of the videotape was apparently not played for the jury during the presentation of the evidence. However, these comments by Cartwright are nearly identical to his testimony describing the April 8 transaction. Accordingly, Liggins was not harmed by the court's decision to play the entirety of the exhibit to the jury. *See Nicholas*, 502 S.W.2d at 174. Thus, we overrule Liggins' sixth and seventh points.

## PRIOR CONVICTIONS

Liggins' eighth, ninth, and tenth points challenge the court's admission of evidence of three prior misdemeanor convictions during the punishment phase of trial. He avers in his eighth point that the court improperly admitted evidence of a prior evading arrest

conviction because the State produced no evidence that he voluntarily waived his right to jury trial in that case. His ninth point suggests that the court erred in admitting evidence of a prior marihuana possession conviction because he did not intelligently and knowingly waive counsel before pleading guilty in that case. His tenth point claims that the court improperly admitted these two convictions and one other which were not shown to be "final convictions."

## WAIVER OF JURY TRIAL

■ Liggins' eighth point complains that the court erred in admitting a prior evading arrest conviction because the State failed to establish that he had voluntarily waived his right to trial by jury in that case. The State offered in evidence a "Probation Order" which contains no recitals about Liggins having waived a jury. The State also offered a docket sheet for the evading arrest case which contains the notation "Waive jury."

The Court of Criminal Appeals has held that a prior conviction may be held void on collateral attack if the accused pleaded guilty without first waiving his right to jury trial pursuant to article 1.13.[6] *Robinson v. State,* 739 S.W.2d 795, 798 (Tex.Crim.App.1987). However, the Court has more recently decided that when an accused:

> does not claim he desired and was deprived of his constitutional right to a trial by jury, that he did not intend to waive a jury trial or that he was otherwise harmed, and the record reflects that the [appellant] agreed to the waiver, we will not set aside a conviction by habeas corpus or collateral attack due to the [accused's] failure to sign a written jury form pursuant to article 1.13.

*Ex parte Sadberry,* 864 S.W.2d 541, 543 (Tex. Crim.App.1993).

■ "Recitations in the records of the trial court, such as a formal judgment, are binding in the absence of direct proof of their falsity." *Breazeale v. State,* 683 S.W.2d 446,

450 (Tex.Crim.App.1985) (on rehearing). Such records carry "a presumption of regularity and truthfulness." *Id.* at 450–51. Thus, when an official record of the court recites that a defendant waived his right to jury trial, "such presumption attains until and unless the contrary is made to appear." *Id.* at 450. On the other hand, "a silent record cannot support a presumption that the defendant formally waived his right to trial by jury." *Id.*

The docket notation indicates that Liggins waived a jury in the evading arrest case. This creates a presumption that he in fact waived his right to trial by jury. *Id.* Liggins argues that this prior conviction is void because "the records do not affirmatively reflect an intentional relinquishment of [his right to jury trial]." He does not contend that "he desired and was deprived of his constitutional right to a trial by jury, that he did not intend to waive a jury trial, or that he was otherwise harmed." *Sadberry,* 864 S.W.2d at 543. Accordingly, we conclude that he may not collaterally attack this prior conviction on this basis. *Id.* Thus, we overrule his eighth point.

## WAIVER OF COUNSEL

Liggins' contends in his ninth point that the court erred in admitting a prior possession of marihuana conviction because the State failed to establish that he had knowingly and intelligently waived his right to counsel in that case. A document filed in the marihuana case and signed by Liggins recites that he "waives his right to counsel and does so knowingly, intelligently and voluntarily after having his rights to representation by counsel explained to him and after the Court duly admonished the Defendant as to the range of punishment attached to the offense."[7]

■ To collaterally attack the validity of prior convictions on the basis of a denial of the right to counsel, the accused must prove that "he did not voluntarily, knowingly, and

---

6. Article 1.13 provides in pertinent part that a defendant's jury waiver "must be made in person by the defendant in writing in open court." TEX CODE CRIM. PROC. ANN. art. 1.13(a) (Vernon Supp. 1998).

7. The document also contains Liggins' waiver of trial by jury and waiver of a record.

intelligently waive his right to counsel." *Garcia v. State,* 909 S.W.2d 563, 566 (Tex. App.—Corpus Christi 1995, pet. ref'd). As we have already stated, when prior convictions are collaterally attacked, the judgments reflecting those convictions are presumed to be regular, and the accused bears the burden of defeating that presumption. *Breazeale,* 683 S.W.2d at 450; *Williams v. State,* 946 S.W.2d 886, 900 (Tex.App.—Waco 1997, no pet.).

Liggins suggests that he has overcome the presumption of regularity by virtue of the fact the trial court in the marihuana case failed to admonish him that his guilty plea could serve as a basis to revoke a DWI probation he was serving at that time. The State's extraneous-offense notice reflects that Liggins' DWI probation was revoked on the same day he pleaded guilty to the marihuana charge.

■ Before accepting a defendant's guilty plea, a trial court must satisfy itself that the accused understands "the consequences of his plea." TEX.CODE CRIM. PROC. ANN. art. 26.13(c) (Vernon 1989). The court is not required, however, to insure that the accused understands the collateral consequences of the plea. *See Ex parte Dumitru,* 850 S.W.2d 243, 244–45 (Tex.App.—Houston [1st Dist.] 1993, no pet.); *accord Cooper v. State,* 492 S.W.2d 545, 547 (Tex.Crim.App. 1973); *Shepherd v. State,* 673 S.W.2d 263, 268 (Tex.App.—Houston [1st Dist.] 1984, no pet.).

■ The fact that a conviction ensuing from a guilty plea can be used against an accused in a separate proceeding is a collateral consequence of that plea. *See Dumitru,* 850 S.W.2d at 245; *Shepherd,* 673 S.W.2d at 268. Thus, the court which accepted Liggins' plea in the marihuana case was under no obligation to admonish him that his conviction could serve as a basis to revoke his DWI probation. Accordingly, Liggins failed to defeat the presumption of regularity which attaches to the recital in the records of the marihuana case that he "knowingly, intelligently and voluntarily" waived his right to counsel. *Breazeale,* 683 S.W.2d at 450; *Williams,* 946 S.W.2d at 900. For this reason, we overrule his ninth point.

## FINALITY OF PRIOR CONVICTIONS

■ Liggins' tenth point avers that the court erred in admitting evidence of the evading arrest, marihuana, and DWI convictions discussed above during the punishment phase of trial because the State failed to prove these were "final convictions." The evidence offered by the State reflects that Liggins received probation in each of these cases. The State offered no evidence before the jury that his probation was revoked in any of the cases.

Article 37.07, section 3(a) provides that during the punishment phase of trial the court may admit:

> any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant ... and, notwithstanding Rules 404 and 405, Texas Rules of Criminal Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (Vernon Supp.1998). Prior to September 1, 1993, the statute specifically defined "prior criminal record" to include "a probated or suspended sentence." *See* Act of May 19, 1967, 60th Leg. R.S., ch. 659, § 22, 1967 Tex. Gen. Laws 1732, 1740, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 5.05, 1993 Tex. Gen. Laws 3586, 3759. In the 1993 Act however, the Legislature deleted the sentence defining the term "prior criminal record" but added language permitting the introduction during the punishment phase of extraneous offenses committed by the accused, "regardless of whether" the accused was "charged with or finally convicted of the crime or act." TEX.CODE CRIM. PROC. ANN. art. 37.07, § 3(a).

It can be argued that the phrase "prior criminal record" no longer includes convictions for which an accused received a suspended sentence because of the Legislature's

deletion of the definition of the phrase formerly provided. Nevertheless, the phraseology adopted permits evidence of prior criminal acts "regardless of whether" the accused was "charged with or finally convicted of the crime." *Id.* A plain reading of the phrase "regardless of whether" contemplates introduction of, among other things, crimes: (1) for which the accused was "finally convicted"; (2) for which the accused was convicted and given a suspended sentence; or (3) which the accused committed but was not charged with or convicted of. *Id.*[8]

Under this reading of article 37.07, section 3(a), the State may properly introduce, during the punishment phase, evidence of a defendant's prior conviction for which he received probation or community supervision, regardless of whether the sentence was subsequently imposed. In this case, the State offered evidence of Liggins' three prior convictions for which he received probation. Article 37.07, section 3(a) permits the admission of such evidence. Thus, we overrule Liggins' tenth point.

### JURY ARGUMENT

■ Liggins argues in his twelfth point that the State made impermissible jury argument during the punishment phase of trial. During the argument, the prosecutor stated, " His misdemeanors, all probations. And never in any of these did the Defendant comply or fulfill his probation." Liggins contends that this argument injected facts outside the record because the State offered no evidence that any of the misdemeanor probations had been revoked. However, Liggins failed to object when the State made this argument.

A defendant must make a timely objection to improper jury argument to preserve the complaint for appellate review. *Banda v. State,* 890 S.W.2d 42, 62 (Tex.Crim.App. 1994); Tex.R.App. P. 33.1(a)(1). If he fails to do so, he forfeits the right to complain about the argument on appeal. *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex.Crim.App.1996).

Liggins concedes that he did not object to the argument. Accordingly, we overrule Liggins' twelfth point because he failed to properly preserve it for our review. *Id.*

We affirm the judgment.

---

**8.** This listing should not be considered exhaustive. *See, e.g., Davis v. State,* 968 S.W.2d 368, 372 (Tex.Crim.App.1998) (evidence of prior unadjudicated community supervision admissible under article 37.07, § 3(a)).