Robert FLORES, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 01–01–00390–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

March 21, 2002.

Rehearing Overruled July 25, 2002.

Lewis Dickson, DeGuerin & Dickson, Houston, for Appellant.

Calvin Hartmann, Asst. Dist. Atty., Houston, for State.

Panel consists of Chief Justices SCHNEIDER and Justices RADACK and

DUGGAN.*

## OPINION

SHERRY J. RADACK, Justice.

Appellant pleaded guilty to the offense of possession with intent to deliver of 400 grams or more of cocaine. *See* Tex. Health & Safety Code Ann. § 481.112(a), (f) (Vernon Supp.2002). In accordance with the agreed recommendation regarding punishment, the trial court assessed punishment at 15 years in prison. The trial court granted appellant the right to appeal the trial court's ruling on the issue of entrapment, and appellant now argues in six points of error that: (1) appellant proved entrapment as a matter of law, or, in the alternative, the evidence is legally and factually insufficient to sustain the conviction because the State did not disprove entrapment beyond a reasonable doubt and (2) for several reasons, the trial court erred in admitting, over appellant's objections, evidence of an alleged prior uncharged extraneous theft offense. We affirm.

### Background

Appellant was a police officer who was a friend of Miguel Angel Gonzalez. In 1996, Gonzalez was indicted for dealing in marihuana in Harris County, Texas. He received seven years deferred adjudication and a $1,000 fine for that offense. Subsequently, in late 1997, Gonzalez was indicted in federal court in Florida for conspiracy to possess marihuana with intent to distribute it and for the substantive crime of actually doing so. In connection with the federal offenses, Gonzalez admitted he had continuously trafficked in drugs from 1993 until the date of his arrest in 1997.

In fact, Gonzalez admitted he had drivers who were delivering drugs for him in California, Florida, Indiana, and Tennessee, even when he was assuring the Texas state trial court which afforded him deferred adjudication for his 1996 state offense, that he would not violate the laws of any state or the United States.

Because Gonzalez was detained without bond on the Florida federal case and faced a minimum of 10 years imprisonment without parole and a $4,000,000 fine, he decided to cooperate with government agents to receive a more lenient sentence. Gonzalez began "debriefing" a Drug Enforcement Agency agent regarding his multistate drug dealings. As a result of his cooperation, Gonzalez was never charged with other offenses, such as tax fraud or money laundering. In addition, he did not forfeit property or pay a fine. His sentence was discounted to 36 months. Following sentencing, Gonzalez was sent to federal prison in Seagoville, Texas and, later, to a halfway house in Houston for the last six months of his sentence. With respect to the adjudication of his prior state drug offense, Gonzalez received the minimum sentence (two years) to run concurrently with his federal time, which meant he effectively received no additional prison time. Gonzalez admitted that he knew that the State of Texas could have "stacked" his prison time, which would have resulted in him going to state prison after he was released from federal custody; it was his understanding that he received leniency because he had become an informant.

During his debriefing sessions, Gonzalez told the DEA agent he had done a "money rip" with appellant, during which appellant and Gonzalez stole $17,000 from a

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

third party.[1] While Gonzalez was in federal custody in Florida, Sergeant Lopez of the Houston Police Department's Internal Affairs Division (IAD) visited Gonzalez regarding appellant's role in the theft. During this visit, Gonzalez described the details of the theft. After Gonzalez returned to Texas from Florida, he and Sgt. Lopez had additional conversations about Gonzalez assisting IAD in making a case against appellant. Gonzalez was ultimately paid $10,000 for his assistance in the case against appellant that is the subject of this appeal.

After Gonzalez was released from prison, Sgt. Lopez visited him in December 1999 at the restaurant owned by Gonzalez's family. During this meeting, Sgt. Lopez asked about a "deal" or "rip" involving a Colombian individual that appellant and Gonzalez had planned before Gonzalez went to prison. Gonzalez and Sgt. Lopez then formulated a "cover story" with which Gonzalez could approach appellant. In the cover story, Gonzalez would tell appellant he had an idea for a "money rip" involving the same Colombian individual they had discussed targeting before Gonzalez was incarcerated.

During February and March 2000, appellant and Gonzalez met several times, both in person and by telephone. Sgt. Lopez was able to record several of the conversations between appellant and Gonzalez because Gonzalez had agreed to wear a hidden microphone. With respect to his instructions regarding how to deal with appellant, Gonzalez's testimony was somewhat contradictory. Gonzalez testified he

"never thought about" the fact he was standing in the shoes of the State of Texas when appellant told him "no" about handling cocaine. Sgt. Lopez told Gonzalez not to try to persuade appellant to do anything, but told him to "keep control" of the conversation. When asked if he heeded the admonition against resorting to persuasion, Gonzalez stated he "kept that in mind." However, Gonzalez also testified he "did what came naturally" in his dealings with appellant. Gonzalez stated the police never told him to back off if appellant was unwilling to be involved in the plan. Instead, he said he "didn't think much of it" when he continued his efforts to persuade appellant to participate in the transaction.

On February 23, 2000, March 6, 2000, and March 9, 2000, Sgt. Lopez recorded conversations between Gonzalez and appellant that generally contained small talk typical among friends.[2] On March 23, 2000, however, Sgt. Lopez recorded a conversation between appellant and Gonzalez that clearly referred to the proposed plan to "rip off" money from a third party. Appellant contends that although he was willing to steal money, he did not want to be involved with stealing or possessing drugs, and that during this conversation, Gonzalez improperly persuaded him to do so (a complete transcript of this conversation, which was admitted into evidence at the entrapment hearing without objection, is attached to this opinion as appendix A). During the conversation, Gonzalez emphasized that the rip-off would be a "sweet" deal and would involve at least $4,000 to $5,000 dollars and a kilo of cocaine. Ap-

---

**1.** Gonzalez described a "money rip" as a transaction in which an individual informs a police officer about the plans of a third party such as a drug dealer who is known to have money. The police officer then pulls over the third party and steals the money the third party is carrying. A "drug rip" follows the

same scenario, but drugs, rather than money, are stolen.

**2.** During the February 23, 2000 conversation, Gonzalez asked appellant if he was still "game," but it is not clear to what Gonzalez referred.

pellant emphasized he was willing to steal the money, but did not want to "mess with" drugs because two officers had recently been discovered with drugs and he considered drugs too "hot." Later in the conversation, appellant stated again he was willing to "do the car with money," but did "not want to mess with the dope where I get it and I bring it to you and all that or I drop it somewhere." However, appellant then asked Gonzalez, "How are we going to transfer the dope into a car," and the two discussed the mechanics of how to accomplish the theft.

At the hearing on the entrapment motion, Gonzalez testified that after he and appellant left the restaurant on the night of March 21, 2000, they drove by Love Elementary School. Appellant pointed out a "no parking" zone where their target could park his car. The two men apparently planned for Gonzalez to direct the target to that location for the phony drug deal. Once the target arrived, appellant would have a reason to approach him because the car was parked illegally. Gonzalez claimed that appellant wanted the deal to be done at night. Gonzalez also testified that appellant stated he "had two of the kilos sold already" and that appellant would drop the remainder in a car that was to be parked in an empty lot near the school.

On March 31, 2000, the night selected for the "rip," appellant saw the target's car parked in the planned location. He verified, by calling Gonzalez, that the car belonged to the target of their plan. The "dealer" who was their target was actually a confidential informant, and appellant's conversation with him was recorded. Ap-

pellant took possession of the bag that contained $5,000 and cocaine. Gonzalez spoke with appellant over the telephone afterwards, and appellant confirmed he had gotten the bag from the car. Police then stopped appellant and recovered the money and cocaine.

Appellant was charged with theft by a public servant of cash money (*i.e.*, the $5,000 that was with the cocaine) and possession with intent to deliver 400 grams or more of cocaine.[3] After the trial court ruled against him on his entrapment claim, appellant pleaded guilty to both the theft and possession offenses. The trial court assessed punishment against appellant at 15 years in prison on the possession offense. He was sentenced to 10 years for the theft offense, to run concurrently with the possession sentence. Appellant does not appeal the theft conviction. However, his guilty plea with respect to the possession offense was conditioned on his right to appeal the trial court's ruling on his entrapment motion.

### Entrapment

In point of error one, appellant argues the trial court erred when it refused to find that appellant was entrapped as a matter of law. In point of error two, appellant contends the evidence is legally insufficient to support his conviction because the State did not disprove entrapment beyond a reasonable doubt and, therefore, viewing the evidence in the light most favorable to the State, no rational trier of fact could have found against appellant on the issue of entrapment. Finally, in point of error three, appellant argues the evidence is factually insufficient to sus-

---

3. Several months after appellant was indicted, the State obtained a superceding indictment that alleged the same possession offense, but added the aggravating claims of use or exhibition of a deadly weapon and that the alleged offense occurred within 1000 feet of a school. The State later abandoned the aggravating claims when appellant pleaded guilty to the possession offense.

tain his conviction because the State did not disprove appellant's showing of entrapment beyond a reasonable doubt and, therefore, appellant's conviction for the offense would work a manifest injustice. Because these points of error are related, we will consider them together.

## A. Burden and Standard of Review

Under Texas law, entrapment is a defense to prosecution. TEX. PENAL CODE ANN. § 8.06(a) (Vernon 1994). Procedurally, an accused is entitled to a pretrial determination of a claim of entrapment. TEX.CODE CRIM. PROC. ANN. art. 28.01 (Vernon 1989). When making its determination, the trial court must follow the provisions as outlined in Penal Code section 2.03. TEX. PENAL CODE ANN. § 2.03 (Vernon 1994); see Taylor v. State, 886 S.W.2d 262, 265 (Tex.Crim.App.1994). At the pretrial hearing, the defendant has the burden of producing evidence raising the defense; after the defendant has met this initial burden, the burden of persuasion falls on the State to disprove entrapment beyond a reasonable doubt. TEX. PENAL CODE ANN. § 2.03(c) (Vernon 1994); England v. State, 887 S.W.2d 902, 908–09 (Tex.Crim.App. 1994); Taylor, 886 S.W.2d at 265; Sebesta v. State, 783 S.W.2d 811, 814 (Tex.App.-Houston [1st Dist.] 1990, pet. ref'd).

■■■■ When conflicting evidence exists on the issue of entrapment, the trial court does not err in overruling a motion to dismiss. Cook v. State, 646 S.W.2d 952, 952 (Tex.Crim.App.1983). The trial court, as the trier of fact, must weigh the evidence and determine whether the defendant was entrapped as a matter of law.

Soto v. State, 681 S.W.2d 602, 604 (Tex. Crim.App.1984); Bush v. State, 611 S.W.2d 428, 430–31 (Tex.Crim.App.1980). On review, the issue of entrapment centers on the legal sufficiency of the evidence. Torres v. State, 980 S.W.2d 873, 875 (Tex. App.-San Antonio 1998, no pet.). The sufficiency of the evidence turns on whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against the defendant on the issue of a defense beyond a reasonable doubt. Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim.App.1992) (citing Saxton v. State, 804 S.W.2d 910, 913 (Tex.Crim.App.1991)).

In this case, appellant moved for acquittal based on his defense that he had been entrapped as a matter of law. The trial court denied the motion, and appellant pleaded guilty to the offense conditioned on his right to appeal the denial of his motion. Therefore, we consider only whether the trial court erred when it denied appellant's motion on entrapment as a matter of law; as we note above, this is essentially a review of whether the evidence is legally sufficient to support the trial court's ruling. See Torres, 980 S.W.2d at 875. We determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt and also could have found against the appellant on the issue of a defense beyond a reasonable doubt. Adelman, 828 S.W.2d at 421.[4]

4. Defenses such as entrapment are subject to a factual sufficiency challenge in the event the defense has been submitted to a jury. See TEX. PENAL CODE § 2.03 (Vernon 1994); see, e.g., Liggins v. State, 979 S.W.2d 56, 60 (Tex. App.-Waco 1998, pet. ref'd) (rejecting State's argument that entrapment defense was not subject to factual sufficiency challenge in case in which the trial court submitted the issue to the jury). However, in this case, appellant pleaded guilty after the trial court denied his motion on entrapment as a matter of law, so

■ We review the legal sufficiency of the trial court's ruling in the light most favorable to the ruling. *Adelman*, 828 S.W.2d at 421. We resolve any inconsistencies in favor of the factfinder's determination. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App.1991).

## B. The Defense of Entrapment

■ Penal Code section 8.06 provides: (a) It is a defense to prosecution that the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

(b) In this section "law enforcement agent" includes personnel of the state and local law enforcement agencies as well as of the United States and any person acting in accordance with instructions from such agents.

TEX. PENAL CODE ANN. § 8.06 (Vernon 1994).

■ The State does not contest that Gonzalez was acting as a law enforcement agent in his dealings with appellant. Therefore, the only question is whether Gonzalez "induced" appellant to commit the offense. To raise entrapment, a defendant must produce evidence that (1) he was actually induced to commit the offense and (2) the inducement "was such as to cause an ordinarily law-abiding person of average resistance nevertheless to commit the offense." *England v. State*, 887 S.W.2d 902, 913–14 (Tex.Crim.App.1994). The first prong is a subjective test; the

defendant must show that *because of* police persuasion he was induced to act. *Torres*, 980 S.W.2d at 876. The second prong is an objective test. *Id.*

With respect to the objective standard, prohibited police conduct usually includes, but is not limited to, matters such as extreme pleas of desperate illness in drug cases, appeals based primarily on sympathy, pity, or close personal friendship, offers of inordinate sums of money, and other methods of persuasion which are likely to cause the otherwise unwilling person— rather than the ready, willing and anxious person—to commit an offense. *Sebesta v. State*, 783 S.W.2d 811, 814 (Tex.App.-Houston [1st Dist.] 1990, pet. ref'd) (quoting *Ramos v. State*, 632 S.W.2d 688, 691 (Tex.App.-Amarillo 1982, no pet.)).

Appellant argues that the uncontested evidence shows that Gonzalez resorted to numerous prohibited tactics in persuading appellant to commit the offense: (1) a plea that Gonzalez needed the money so he could keep the family restaurant from going bankrupt and could continue to support his elderly mother; (2) a play on their close, personal friendship; (3) an offer of an inordinate sum of money; (4) repeated, specific requests to commit the offense; (5) a disregard of appellant's statements that he did not want to "mess with" drugs; (6) a false assurance to appellant that there was no difference between stealing money and stealing drugs; (7) a characterization of the money "rip" as a "sure deal;" (8) constant interruptions of appellant in an attempt to keep control of the conversation; (9) gestures and clapping to "create excitement and enthusiasm" about the plan; (10) use of emphatic tones and changes in tone of voice to encourage and

the issue was never submitted to a jury. Therefore, we review only whether the trial court was correct in determining that appel-

lant did not establish entrapment as a matter of law.

persuade; and (11) pleas and begging for appellant to commit the offense.

Based on our review of the record, we disagree that the evidence regarding several of the alleged improprieties was uncontested. We also disagree that the alleged improprieties rise to the level of persuasion that would have induced an ordinary, law-abiding citizen to commit the offense. Although the recording of the March 21, 2000 conversation between appellant and Gonzalez speaks for itself, there are several areas in which the trial court could have, and apparently did, conclude that Gonzalez's conduct was not as appellant describes. First, the tape indicates that Gonzalez did discuss a loan he was seeking to keep his restaurant running and also mentioned he needed to hire music groups as entertainment. However, there are no statements that indicate he used this information to pressure appellant to commit the offense. Further, the closeness of the friendship between appellant and Gonzalez was contested. Gonzalez testified that he and appellant were merely acquaintances. Even though they had known each other for approximately six years before the date of the offense, Gonzalez had been in federal prison for three of those years. Moreover, there was evidence that appellant often ignored Gonzalez's telephone messages and did not attend meetings the two men had scheduled. Next, the record does not indicate Gonzalez offered the appellant an inordinate sum of money to commit the offense. Although the recording indicates Gonzalez told appellant he could keep *all* the money that was in the car, even if it was $20,000, Gonzalez repeatedly told appellant that he believed $4,000 to $5,000 would be the amount of money involved in addition to the cocaine. Finally, appellant's statements that he did not want to "mess with" drugs are not, as appellant argues, an unequivocal rejection of the idea of committing the offense. Looking to the entire March 21, 2000 conversation, the trier of fact could have concluded that appellant wanted to participate in the "rip," but did not want to physically handle the drugs because of the consequences involved if he were caught.

Turning to the appellant's remaining complaints about Gonzalez's conduct, appellant's complaints that Gonzalez (1) used repeated, specific requests that he commit the offense, (2) falsely assured appellant that there was no difference between stealing money and stealing drugs, (3) characterized the money "rip" as a "sure deal," (4) constantly interrupted appellant in an attempt to keep control of the conversation, (5) gestured and clapped to "create excitement and enthusiasm" about the plan, (6) used emphatic tones and changes in tone of voice to encourage and persuade, and (7) pleaded and begged appellant to commit the offense, the record again (including Gonzalez's testimony and the transcript of the March 21, 2000 conversation on which appellant relies) indicates that the trial court could have concluded the alleged improprieties simply did not rise to a level of persuasion that would have induced an ordinary, law-abiding citizen to commit the offense. In connection with these specific complaints, however, an additional consideration remains: whether these tactics *actually induced appellant* to commit the crime. With reference to this subjective prong of the test, the trial court could have concluded beyond a reasonable doubt that appellant, a police officer, knew the difference between stealing drugs and money (as evidenced by his statements that indicate he was reluctant to personally handle the drugs), knew the risks involved, and made an informed decision to proceed with the plan.

We hold that a rational trier of fact could conclude beyond a reasonable doubt,

viewing the evidence in the light most favorable to the trial court's ruling, that Gonzalez's conduct would not likely cause an otherwise unwilling person to deliver drugs and or that his conduct actually induced appellant to do so.

Accordingly, we overrule points of error one, two, and three.

### Admission of an Uncharged, Prior Offense

In points of error four, five, and six, appellant argues the trial court erred in admitting, over his objection, Gonzalez's testimony that appellant had been involved in a "money rip" with Gonzalez in 1996 and statements from the March 21, 2000 tape-recorded conversation regarding that previous act because: (1) the evidence was not relevant to prove either prong of the test for entrapment; (2) the evidence was insufficient to prove that the alleged crime had been committed beyond a reasonable doubt; and (3) even if the prior offense was relevant and sufficiently proved, the trial court improperly considered the evidence in connection with the objective prong of the entrapment test.

### A. Standard of Review

■■■■■ We review a trial court's evidentiary rulings under an abuse of discretion standard. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *Pierre v. State*, 2 S.W.3d 439, 442 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd). We recognize that a trial court must be given wide latitude to admit or exclude evidence. *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim.App.1992); *Pierre*, 2 S.W.3d at 442. If the trial court's evidentiary ruling is

within the zone of reasonable disagreement, we may not disturb its ruling. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990); *Sunbury v. State*, 33 S.W.3d 436, 441 (Tex.App.-Houston [1st Dist] 2000, no pet.)

### B. Analysis

■■■■■ In *England v. State*, the Court of Criminal Appeals held that Penal Code section 8.06 requires a defendant who claims entrapment to produce evidence that he was actually induced to commit the charged offense; that is to say, that he committed the offense "because he was induced to do so." For that reason, prior, extraneous offenses are relevant to the question of whether a defendant was actually induced by law enforcement to commit the charged offense and, therefore, are admissible. 887 S.W.2d at 913. However, the State may not simply invoke "context" of the offense to justify admission of "other crimes, wrongs or acts." *Id.* at 915. Instead, the State must show the previous misconduct has some tendency to make more or less probable a fact of consequence to the determination of the issue of persuasion—or at the very least, that the character or degree of persuasion the police used cannot be fully comprehended absent evidence of the past misconduct. *Id.*

In this case, evidence that Gonzalez and appellant had engaged in a similar "money rip" in 1996 was relevant to the question of whether Gonzalez's conduct actually induced appellant to engage in similar conduct at issue in this case. Further, the fact that Gonzalez and appellant had a pre-existing relationship that included similar[5]

5. We acknowledge that the 1996 "rip" involved money alone. However, the fact that the scheme for which appellant was charged *in this case* apparently followed the same scenario as the previous plan carried out by Gonzalez and appellant (but for the fact that drugs *and* money were involved in the more recent theft) renders the distinction insignificant.

conduct assisted the trier, of fact in comprehending the degree and nature of the persuasion that the police, through Gonzalez, employed. The fact that Gonzalez and appellant had stolen money in a similar manner on a prior occasion explained why Gonzalez was able to approach appellant a second time. Therefore, the evidence was relevant and admissible.

 Next, appellant argues the State did not establish the extraneous offense beyond a reasonable doubt. *See George v. State,* 890 S.W.2d 73, 75–76 (Tex. Crim.App.1994). We disagree. Appellant did not contradict Gonzalez's testimony regarding the 1996 theft. Further, the transcript of the March 21, 2000 tape recording corroborates Gonzalez's testimony that appellant and Gonzalez had engaged in a previous theft. When Gonzalez mentions the previous offense, appellant did not deny that he had taken part in the theft or that he did not know to what Gonzalez referred. Any of appellant's statements on the March 21, 2000 tape recording regarding the prior offense were admissible because a criminal defendant's own statements, when being offered against him, are not hearsay. Tex.R.Crim. Evid. 801(e)(2)(A); *see Trevino v. State,* 991 S.W.2d 849, 853 (Tex.Crim.App.1999). Additionally, the fact that he did not dispute Gonzalez's statements regarding the previous scheme operates as an adoptive admission and, therefore, is evidence of appellant's guilt. Tex.R.Crim. Evid. 801(e)(2)(B); *Alvarado v. State,* 912 S.W.2d 199, 215 (Tex.Crim.App.1995). Therefore, the trial court did not abuse its discretion when it impliedly concluded the State had proved the prior offense beyond a reasonable doubt.

 Finally, we reject appellant's argument that the trial court *must have* improperly considered the prior conduct in connection with the objective prong of the entrapment analysis based on the statements the trial court made when it ruled on the entrapment motion. In order to prove entrapment as a matter of law, appellant was required to prove both prongs of the test. *See England,* 887 S.W.2d at 913–14. We have concluded the evidence was relevant to the subjective, actual inducement, prong of the test. Therefore, it was admissible. The fact that the trial court stated it believed there was a fact issue for the jury to decide regarding the objective prong of the test is not a basis for concluding that the trial court considered the extraneous offense evidence for an improper purpose.

We overrule points of error four, five, and six.

### Conclusion

We affirm the trial court's judgment.

### Appendix A

Robert: What all you got there?

Miguel: These are my proposals that I been doing ... you know, that I been telling you I was working on ... there's this business company that I deal with ... a small business ... they do my, uh ... everything's on here ... that what I'm trying to borrow. But, I went up to 300,000 ... yea, I went up to 200,000 ... they programmed it real good.

Robert: So, what'd they say?

Miguel: That guy ... that guy hadn't told me nothing yet. He hadn't told me anything. And uh, but I'm going to see what, what's up with that shit, man. So, if we do it, it'll be good, Junior, real good.

Robert: That's a lot of cheese there, buddy.

Miguel: Yeah, but I got a lot of equity here ... cat dad, cat daddy over there (laughing).

Robert: Man, you lost a lot of weight there, man.

Miguel: Yea, I gained three pounds already. But, I been working out ... working out again.

Robert: How are your kids?

Miguel: Shit, they're getting big, bro ... my little girl ... (interruption) and Iris ... she, she saw you ...

Robert: (inaudible)

Miguel: Uh, at the carnival, I think. At the carnival at the, uh ...

Robert: Rodeo? I didn't ...

Miguel: At the rodeo. No, she didn't talk to you but, she did ... she saw you there.

Robert: Did she see me with my little boy?

Miguel: Let me tell you what's going to happen. It's Bar-B-Que, OK? It's the sweetest deal ... real sweet, OK? I'll ... next week ... I mean, I know for a fact it's going to happen. When I was trying to call you ... hey look, the guy's got ... he had keys and had $5000 in it. That's no problem. But, he probably had a little bit more. Supposedly, he's coming next week again, el camarado mio ... like taking ... you know how we did it the first time. It's even sweeter. The guy gets in the room ... (inaudible) ... I know where the car is at ... I tell you the color of the car. When he pulls out, bro, the guy no tiene juevos ... nada, a peon. You pull him over. He gots it under the seat ...

Robert: What's under the seat?

Miguel: Una llave.

Robert: (whispering) But, uh, I don't want to mess with that ... (interrupted)

Miguel: Listen. Listen ... I mean, eso ... and the money ... you keep the money ... and ... it's over $5000. You keep the money. Don't worry about that.

Robert: But, but, I got to get that bag out of the car.

Miguel: Yea, but it'll be alright. It'll be in the bag, man. It would be nothing. Just like we got that other money, man.

Robert: (Starts to speak but, is cut off)

Miguel: Umm, hey, look ... and this is the beauty of it. You set the time you can do it. You set it.

Robert: Yea, but, man, I don't even want to mess with that, man. I don't want to mess with that. I thought it was the money we did the last time. I don't want to mess with that shit. I'm not lying to you. Man, let me tell you, it's so hot right now. They already popped two officers doing that.

Miguel: Yea, I heard about that. One constable and then a sheriff ... something ... couple of months back?

Robert: They're officers. They popped them on that shit. I don't want to mess with nothing, if we gotta mess with that shit. OK, just like the last time ... it was easy. Man, I'm not lying.

Miguel: You doing the same thing.

Robert: But, I gotta go grab that thing.

Miguel: OK.

Robert: (Inaudible)

Miguel: The guy has ... he has to ask me. He has to ask me if I could take the money from him ... mandato ... (inaudible) ... that's not a problem.

Robert: What you mean, it's not a problem?

Miguel: It's a lot better for me. Me entiendes?

Robert: I know but ... (interrupted)

Miguel: Ok, now, OK, now ... just say (inaudible) ...

Robert: We can't do it like that.

Miguel: What, the money? Oh, we can. I'll set it up. I'll say, "Look, man, I don't want to do it, I don't want to do it." I, I want the money quick. He'll give me maybe a couple of thous, two thousand, whatever ... but ...

Robert: What happened there when we were gonna set up your sister and she was gonna have the money and all that?

Miguel: (clearing his voice): She was going to have the weed ... I was going to have her ... you were gonna ... you were gonna pull her over ... she was going to have the weed in the car, remember?

Robert: And we were gonna have a wrecker pick up the car?

Miguel: No ...

Robert: What happened?

Miguel: Well, that dude never came through. But, this other dude, the Colombiano, is coming through.

Robert: How many llaves can he give you?

Miguel: Oh, man, probably about one or two, easy. See, they're gett'n a feel ... a feel of me. I know that's what it is, Junior.

Robert: They want to give you a whole little.

Miguel: They will, they will, Junior. That's not a fucking problem. They will, they will.

Robert: I don't wanna ... (interrupted)

Miguel: It's nothing, Junior. It's nothing.

Robert: I don't wanna mess with that shit ... that shit, man. I mean, the way ... the money ... the way the money, man ... it was ... to me that was a piece of cake. (inaudible) ... Say if he has 5,000 dollars in the car. We could do that. We could do the car with money ... but, I don't want to mess with the dope where I get it and I bring it to you and all that or I drop it somewhere. I don't even want to touch that. It was just scary when I got ... that shit, threw it to you and I took off, remember?

Miguel: Yea. (laughing).

Robert: But, I mean ... like it's easier cause it's money. If it's dope ... I don't even want to fool with no dope.

Miguel: Man!

Miguel: (continuing): Man, what about if the mother fucker has 50 keys, man? ... (inaudible). Just say if we have 50, 40 keys and I tell him, fuck ... that's a lot of fucking cheese, Junior.

Robert: I don't mind doing it, but not ... (inaudible)

Miguel: Yea, but the guy ... (inaudible) ... the guy that's doing the dope gives him the rundown. This guy, el bato es como otro, OK? ... (inaudible) ...

Robert: OK, say about 5000, right?

Miguel: Yea.

Robert: What's going to happen to that car that has the dope?

Miguel: Nothing. You let the mother fucker ... you just ask for his driver's license and after you get the money ... the guy is going to get paranoid. I know.

Robert: What I'm saying is, how are we going to transfer that dope into a car?

Miguel: ... (inaudible) ... whatever you wanna do. I can ... I can have

"Chorte" and, uh, uh, hang so quick along wherever you're gonna pull him over ... (inaudible) ... I'll tell you what hotel he's at when he gets here, right? Just for an example ... just say ... just say for an example ... (inaudible) ... He's have to do it ... (inaudible) ... OK? Alright, OK, Junior. You're gonna pull him over someplace in there. You more or less know a guy like that ... I'm gonna tell you when he's gonna come, cause I know what's he's gonna come to. He may be coming this way towards uh,

Robert: Uh-huh

Miguel: (continuing): ... into 45, right? You're gonna pull him over ... say you pull him over on the freeway. The next thing you're gonna check ... let's just say that ... it's a good example ... just an example, bro. You get up to the vehicle. The guy is gonna give you his fucking driver's license. He ain't gonna wanna do ... no va pidar.

Robert: I know but ... (interrupted)

Miguel: You get it ... no, no, just a second ... "you being terco" ... Let's say we do the one's right now. Let's say we do for a couple of thousands apiece. Just say he's got a key ... (inaudible) ... thousand ... come on, bro ... (inaudible) ... that's why it's fucking gravy, bato. You gotta ... you have that little bag ... lock him up for a little bit of, uh, uh ... look, you don't have to ... whatever you want to do. I don't care. How you want it. The money will be in there ... the money's gonna be in there. You take the fucking money and you stay with it. It's gonna be over 4,000 dollars, I guarantee you that ... guarantee. That you stay

with practically automatically. No hay pedo. I make a little extra something, you te doy tambien alli ... (clapping). Yea, fuck it. You get it, you take it over ... you go to tour car ... (inaudible) ... (clapping) ... just drop it in the car ... that's it. You don't have to worry about it. Nobody's gonna know but you and me ... I'll have another car, cause I can't ...

Robert: You know, you know what I can do is, uh, tell you the vicinity where I'm gonna pick it up and come meet me there and just drop it off.

Miguel: Como? Como?

Robert: Remember what we did the last time ... ?

Miguel: ... (inaudible) at the church?

Robert: No, where ... (interrupted)

Miguel: Yea, yea, yea, yea, yea.

Robert: Where ... you know, I'm not going to pull him over on the freeway.

Miguel: No, no, no, no ... I know.

Robert: Somewhere on the street.

Miguel: You tell me, guy.

Robert: I'd rather it be at night.

Miguel: That's not a problem. Look, I can set it ... I can set it up the way you want it but, check this out. Say he's at a hotel. You tell me what time and I can set it up. You tell me which way you want him to go and I'll say, "hey, meet me this way, but, go this way ... go down ... go to, uh, go six streets up. I'm talking about Puro pedo. (clapping). I'm just using an example. You tell me, bro ... I want him to go through ..." Fine! Alright, I'll set him up. That's as simple as that. He'll do what I say, bro. Just like it. And it's safer. This is more easier than what you did with me. This guy is nothing. This guy ... when he see you ... (chuckling) ...

easy, Junior. He's coming ... he's coming this fucking weekend. On Monday, he'll fly in. We'll set it up for a Thursday of next week or Wednesday of next week. Easy, Junior! The money will be in there ... you get the money and ... (interrupted)

Robert: And it's only going to be one?

Miguel: It's only going to be one, Junior ... one key. And if it's two, I'll let you know ... you'll feel it. I'm not going to lie to you. I didn't lie to you the last time ... If it's more, you check it out and I'll give you the rest. But you are gonna have over ... over 4 or 5 thousand dollars in there ... and if there's more than 5,000, you keep it. Just give me a thousand dollars. If he gots 10 thousand, 20 thousand ... you keep it. It's yours. Hey, that's my call. I don't care. I know there's gonna be some money in there. All of it'll be yours. It ain't gonna be no 500 grand and I'm not that ... I know it's gonna be in there. It's easy, Junior, easy!

Robert: Well, I'll think about it.

Miguel: (at the same time): Easy!

Miguel: Don't think about it! Tell me dawg! ... Junior, it's easy, Junior. Junior, it's easy, junior ... and I need to get that because I want to get the fucking groups going here, man. Please, Junior ... It's that fucking simple.

Robert: Let's go over there and sit down at the table ... (inaudible)

Miguel: (laughing). OK. You got all this week to fuck with it, Junior.

Robert: No, I know ... let's eat at the table ... (inaudible)

Miguel: Come on. (laughing).