**Cornell Wade SHAW, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–98–239–CR.**

Court of Appeals of Texas, Waco.

June 23, 1999.

Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, Criminal District Attorney, Randy W. Bowers, Asst. District Attorney, Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

TOM GRAY, Justice.

A drug related murder occurred in a Waco neighborhood. The victim died of multiple stab wounds. We are asked to determine if the jury could properly reject the defendant's claim of self-defense. When the defendant introduces evidence that he acted in self-defense, the state bears the burden of showing beyond a reasonable doubt that the force used was not reasonable or justified. Because we hold the jury's rejection of self-defense was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, we will sustain the conviction for murder.

### BACKGROUND FACTS

Cornell Shaw admitted selling the victim, Robert Koenig, Jr., a "rock" of cocaine. Koenig complained to Shaw about the quality of the crack-cocaine "rock" sold to him by Shaw. Shaw agreed to return twenty dollars to Koenig: the amount paid for the crack-cocaine. On March 29, 1997, Koenig confronted Shaw in a residential neighborhood and demanded the twenty dollars. The confrontation quickly turned into a physical altercation between Shaw and Koenig. Both men were in their thirties. During the altercation, Koenig was stabbed six times and died as a result of his wounds. Shaw left the scene of the altercation before police arrived.

According to the autopsy of Koenig, he died from several knife wounds. The various wounds perforated a chamber of his heart, grazed his liver and left lung, and also penetrated his hip bone, ribs, colon, chest, diaphragm, and neck. Koenig died at the scene of the altercation within a few minutes of when it began.

Shaw turned himself in to the police. He was charged with the murder of Koenig, under the Texas Penal Code, Section 19.02. Shaw claimed that he acted in self-defense when he stabbed Koenig. The jury rejected his self-defense claim and found him guilty of murdering Koenig. Punishment was assessed by the jury at 12 years in prison. In his only issue, Shaw contends that the evidence is not factually sufficient to support the jury's rejection of self-defense.

### FACTUAL SUFFICIENCY IN THE SELF–DEFENSE CONTEXT

■ Under § 9.32 of the Texas Penal Code, a person is justified in using deadly force against another if a reasonable person in the actor's situation would not have retreated. TEX. PENAL CODE ANN. § 9.32(a) (Vernon 1997). Further, such force is only justified when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Id.* at (a)(2),(3). The justification of self-defense is a defense to prosecution for murder. *See* TEX. PENAL CODE ANN. §§ 9.02, 9.32 (Vernon 1997). The State has the burden of persuasion in disproving evidence of self-defense. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim.App.1991). The State is not required to affirmatively produce evidence which refutes the self-defense claim; rather, the State has the burden to prove its case beyond a reasonable doubt. *Id.*

■ Shaw maintains that the proper standard for reviewing the jury's rejection of his defensive theory is the standard articulated in *Clewis v. State*, 922 S.W.2d 126, 134–135 (Tex.Crim.App.1996). We agree. Self-defense is subject to a factual sufficiency challenge and review under the *Clewis* standard. *See Liggins v. State*, 979 S.W.2d 56, 60 (Tex.App.—Waco 1998, pet. ref'd); *Ojeda v. State*, 945 S.W.2d 197 (Tex.App.—San Antonio 1997, no pet.); *Jones v. State*, 951 S.W.2d 522, 527 (Tex. App.—Beaumont 1997, pet. ref'd). In our review for factual sufficiency of the evidence we consider all the evidence in the record related to the contested issue, "not just the evidence which supports the verdict." *Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997). We reverse

only if rejection by the jury of Shaw's evidence of self-defense is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Hernandez v. State*, 938 S.W.2d 503, 512 (Tex. App.—Waco 1997, pet. ref'd).

## EVIDENCE AT TRIAL

The following evidence was adduced at trial.

### Robyn Koenig

Robyn Koenig, the sister of Koenig, testified that both she and the victim took Tae Kwon Do classes more than ten years prior to the altercation. Both Koenig and Robyn attained several black belts while they were teenagers. Neither had taken karate classes during the intervening sixteen years. Robyn also testified that she knew very little about karate and that she felt that the instructor had merely "run them through" the belt system and was just "trying to make us feel good."

On cross-examination, Robyn testified that though Koenig had gone to several competitions, he had only received one third place trophy when he was sixteen.

### Officer Claire Crook

Officer Crook testified that she received a call to a residential neighborhood in Waco at 8:53 p.m. on March 29, 1997, of a stabbing in progress. She and Officer Mason arrived at the location of the call where there was a large crowd gathered. Officer Crook stated that Koenig was lying on his back, in the street. He was covered in blood while being held by another man. She testified that he looked critical and that she called an ambulance and the Special Crimes Unit. She and Officer Mason sectioned off several blocks, and canvassed the neighborhood. At the time of canvassing, all persons with whom they spoke denied having seen anything. No weapon was found.

On cross, Crook testified to the location of blood splatters at the site and that there were two or more cars at the location. She also testified that James Gilbert, Mark Anthony Gilbert, and their mother, Hattie, lived at the house located at the site of the incident.

### Gene Jones

Jones testified that he was the roommate of Shaw at the time of the incident and that he had known Shaw for seven or eight years. He testified that on the day of the incident, he and Dwayne Hardin were outside barbecuing when Shaw arrived. Jones did not see Shaw arrive because he had smoke in his eyes. He heard the faucet turn on and Shaw began talking to him as he washed his hands. According to Jones, Shaw stated: "I done fucked up. I hope I killed the white mother-fucker."

On cross, Jones testified that he initially thought Shaw was not serious when he made this statement. In an effort to raise the issue of self-defense, the defense attorney asked about any potential respiratory difficulty suffered by Shaw. Jones testified that Shaw had been sick at one point and had used what may have been an inhaler.

### Dwayne Hardin

On direct, Hardin testified that he saw Shaw prior to the murder and that he was afraid of Shaw at that time because he was "acting deranged." On the evening of the murder, he stated that he saw Shaw walk to the faucet to wash his hands. According to Hardin, Shaw was holding a folding knife that had a five to six inch blade. Hardin claims that Shaw stated, "I just have stabbed the white boy and I hope I killed him," and "He shouldn't have hit me." Hardin made a statement to the police that night about what he had witnessed. Hardin further testified that though he had charges pending, he had made no deals with the district attorney about his testimony.

On cross, Shaw challenged Hardin because the original statement written down by the police did not include Hardin's statement that Shaw was acting deranged. Hardin never denied making the statement but acknowledged that this statement was not included in his original statement as written down by the officer.

*Randy Aleman*

Officer Randy Aleman testified that he was on duty as the Commander in the Detective Office on April 1, 1997, when Shaw came in and confessed that he was responsible for killing Koenig on March 29.

*Dr. Lynn Salzberger*

Dr. Salzberger, a Forensic Pathologist at the Dallas County Medical Examiner's Office, testified that she examined and performed the autopsy upon the body of Koenig. She testified that in her opinion, Koenig died of multiple sharp force injuries including:

1) a stab wound 6 and ¼ inches deep entering through the chest, traveling through the ribs and diaphragm, which perforated a chamber of the heart and grazed the liver;

2) another wound 2 and ¾ inches deep, located on the backside of Koenig, between the ribs, which grazed the left lung;

3) one wound 5 and½ inches deep which penetrated the hip, the hip bone, the colon, and the psoas muscle, a deep muscle in the buttock area;

4) another wound ¾ inches deep that was small;

5) a wound to the buttocks, 1 and½ inches deep; and

6) an incise wound to the neck which was 4 and½ inches long and½ inch deep, which sliced the neck muscles.

After detailing the wounds, Salzberger testified that the 6 and ¼ inch wound, the 2 and ¾ inch wound, and the 5 and½ inch wound were the most serious wounds, respectively (numbers 1, 2, and 3). She also testified that while the wound to the neck was capable of causing serious bleeding over time, it had not hit a major blood vessel. It was her opinion that the other three wounds were more serious. She concluded testimony detailing the wounds by concluding that there were no defensive wounds on the body of Koenig but that such wounds are not always present in a stabbing.

Salzberger also testified that Koenig had a blood alcohol level of .22, that he was covered with scrapes and bruises, and that he tested positive for cocaine and cocaine byproducts. According to her testimony, the autopsy showed that alcohol and cocaine had been ingested recently and in close proximity with one another.

During Shaw's defense, the witnesses he called testified as follows:

*Wanda Wallace*

Wallace, who had known Shaw for two years prior to his arrest, testified that Koenig came over to her house the night before the altercation. Wallace stated that Koenig threatened to "do something" to Shaw if he did not pay him back for the poor quality crack. She also testified that she believed Koenig was serious about his threat.

On cross, Wallace also testified that Shaw came to her house after the altercation and admitted to having stabbed Koenig.

*Marcus Anderson*

Anderson testified that he had known Shaw for six years prior to Shaw's arrest. He stated that on the day of the murder, but prior to the altercation, Koenig dropped by his house looking for Shaw, stating, "You tell that black son-of-a-bitch I'm going to kill him." He also stated that he saw the fight between the two men, that Koenig had tried to force Shaw into a car, and that Shaw would not get into the vehicle. He further testified that Koenig rushed Shaw while throwing karate kicks, then managed to get Shaw into a "headlock." According to his testimony, Shaw yelled that he could not breathe and asked to be let go. Finally, he stated that Shaw cut Koenig while in the headlock position, causing Koenig to let go of Shaw. Finally, Anderson stated that Koenig rushed Shaw again and that Shaw responded by stabbing him again.

On cross, the prosecution asked Anderson to demonstrate the headlock position he claimed to have seen Koenig use

on Shaw, but Anderson was not able to demonstrate. Anderson admitted that he told the police he had seen nothing the night of the murder.

### Jermaine Gilbert

Jermaine testified that he saw the fight between the two men, that Koenig had a "choke hold" on Shaw, that he saw Koenig fall to the ground, get up, and attack Shaw again. He also testified that he heard Koenig threaten Shaw prior to the fight. His testimony puts Anderson's arrival at the end of the fight. When asked why he did not go to the police with the information that he knew, he claimed that he left the scene of the crime because he did not want to be involved in any way.

### James Gilbert

James, who admitted that he is a convicted felon and awaiting a murder trial, claimed that he knew Shaw from the neighborhood and that he knew Koenig because he paid Koenig to work on his car. He testified that Koenig came by his house looking for Shaw. He also testified that he saw the fight between the two men, that Koenig attempted to force Shaw into his car, Shaw resisted, Koenig grabbed him by the neck, and Shaw responded by stabbing him. In his testimony, he claims that Koenig became more aggressive after he was stabbed. His testimony puts the 6 and ¼ inch wound to the ribs and heart as the first wound, the 2 and ¾ inch wound which grazed the lung as the second wound, and the wound to the neck as the last wound.

### Cornell Wade Shaw

Shaw testified that he knew Koenig from the crack-cocaine deal. He stated that Koenig complained of the quality of the drug and that they had agreed that Shaw would return Koenig's twenty dollars. He testified that at the time of the fight, Koenig tried to force him into a car. Shaw responded by resistance and Koenig kicked him in the stomach. He further testified that Koenig managed to get him into a neck hold which prevented him from breathing. Shaw claimed that he took out his knife and stabbed Koenig in order to get free, but that Koenig responded with more aggression. When asked why he stabbed Koenig, he stated "I wanted out of the situation I was in." He claimed that Koenig was stronger. Shaw also testified that he had asthma for a few years prior but that he had not sought treatment from a doctor.

On cross, Shaw testified that Koenig had both hands around his neck and that he only stabbed him in order to get free. When asked how the other stab wounds occurred, he stated that Koenig might have fallen on the knife accidentally. He admitted that he was six inches taller than Koenig and that he did not cry for help even though there were twenty or more witnesses watching. He denied stating that he hoped he had killed Koenig.

### Dr. David Schickner

During the State's rebuttal case, Koenig's medical doctor, Dr. David Schickner, testified that Koenig's arm had been crushed in an industrial accident which left his upper body 73% impaired with an impairment of 44% overall. He further testified that movement in Koenig's left arm was limited, that any movement in his elbow caused intense pain, and that he could easily overcome Koenig's arm during strength testing.

During cross, the doctor testified that the upper deltoid muscle had a normal range of motion and that Koenig had recently gained minor flexibility in three of his fingers.

### APPLICATION OF LAW TO FACTS

█ Through witness testimony, Shaw presented evidence that Koenig had him in a headlock or choke hold position. He asserts that his use of deadly force was justified because Shaw was choking him. The testimony offered by Shaw and his witnesses create a fact issue on self-defense and the use of deadly force. Shaw maintains that Koenig held him around the neck, preventing him from breathing. The prosecution maintains that Koenig was unarmed and did not have full use of his upper body and left arm.

We must give due deference to the jury's assessment of the credibility of the witnesses and the weight to be given their testimony. *Clewis*, 922 S.W.2d at 135; *Hernandez*, 938 S.W.2d at 512. The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex.Crim.App. [panel op.] 1981). The jury was required to find beyond a reasonable doubt that deadly force was not justified in this case. It is possible that the jury could believe the testimony produced by the State and the testimony produced by Shaw and still reject the self-defense claim. If the jury believed both that Shaw's breathing was being restricted and that Koenig was physically lame from an accident, they could still conclude that it was not reasonable to use deadly force in response to the situation.

Shaw urges us to find that the evidence overwhelmingly favors his claim of self-defense in that all of his eye witnesses claim that Koenig attacked him first, attempted to choke him, and continued to attack him after having been stabbed. The State attempts to contradict this testimony by introducing evidence of statements made by Shaw after he stabbed Koenig, while also showing that each witness called by Shaw knew him for some time before the altercation took place and did not come forward with any information on the night of the altercation. While such evidence may or may not be in conflict, it is for the jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982). Even where there is no conflict, the jury may give no weight to some evidence, and thereby reject part or all of a witness's testimony. *See Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App.1987); *see also Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim.App.1991) (holding jury as judge of credibility may "believe all, some, or none of the testimony").

CONCLUSION

Considering all the evidence, both for and against the verdict, we conclude that the evidence is factually sufficient to support the jury's rejection of Shaw's self-defense theory. From our review of the evidence, we cannot say that the verdict "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis*, 922 S.W.2d at 134; *Hernandez*, 938 S.W.2d at 512. Thus, we conclude that the evidence is factually sufficient to support the verdict that Shaw is guilty beyond a reasonable doubt of murdering Robert Koenig, Jr. Accordingly, we overrule Shaw's only issue.