11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Otis T. Minafee

Appellant

Vs.                   No.  11-01-00238-CR C Appeal from Dallas County

State of Texas

Appellee

 

The jury
convicted appellant of murder and assessed his punishment at confinement for
life and a $10,000 fine.  We affirm.

In his
fourth point of error, appellant complains that the evidence is factually
insufficient to support his conviction. 
In deciding whether the evidence is factually sufficient to support the
conviction, we must review all of the evidence in a neutral light favoring
neither party to determine if the evidence is so weak or the verdict is so
against the great weight of the evidence as to be clearly wrong and
unjust.  Goodman v. State, 66 S.W.3d 283
(Tex.Cr.App.2001); Johnson v. State, 23 S.W.3d 1 (Tex.Cr.App.2000); Clewis v.
State, 922 S.W.2d 126 (Tex.Cr.App.1996). 
We review the fact finder=s weighing of the evidence and cannot substitute our judgment for that
of the fact finder.  Cain v. State, 958
S.W.2d 404 (Tex.Cr.App.1997); Clewis v. State, supra.  Due deference must be given to the jury=s determination, particularly concerning the
weight and credibility of the evidence. 
Johnson v. State, supra; Jones v. State, 944 S.W.2d 642
(Tex.Cr.App.1996), cert. den=d, 522 U.S. 832 (1997).  This
court has the authority to disagree with the fact finder=s determination Aonly when the record clearly indicates such a
step is necessary to arrest the occurrence of a manifest injustice.@ 
Johnson v. State, supra at 9.








Officer
Michael Hunter with the Balch Springs Police Department testified that on
August 9, 1999, he was dispatched to 11216 Erich Drive in Balch Springs at 4:10
a.m. in response to a shooting at that residence.  Officer Hunter was met at the scene by a slightly injured female,
who took him into the bedroom where appellant was lying on the floor beside the
bed.  Officer Hunter stated that shots
had been fired into the front of the house. 
Appellant was taken to the hospital shortly after Officer Hunter
arrived. 

Detective
Jim Spurger arrived at the scene after appellant had been taken to the
hospital.  Detective Spurger received
consent to search the residence from Shanta Calloway, appellant=s girlfriend who lived at the residence with
appellant.  Detective Spurger stated
that the officers found a large amount of marihuana in the garage and scales in
the living room.  Detective Spurger also
found a bullet hole in the kitchen ceiling which was inconsistent with the
shots fired at the front of the house. 
Ashes were still smoldering in a trash can in the backyard.  

Detective
Spurger met with Calloway later that morning, and Calloway gave a written
statement about the marihuana that was found at the residence.  Calloway gave consent for the officers to
search a gray Buick that was parked in front of the residence.  After giving her statement, Calloway was
arrested for possession of marihuana and outstanding traffic warrants. 

Detective
Spurger then met with appellant at the hospital, and appellant gave a written
statement about the marihuana.  After he
had taken appellant=s
statement, Detective Spurger called the Dallas Police Department to see if they
were Aworking anything whatsoever that could
possibly relate to this offense.@  Based upon information
received from the Dallas Police Department, Detective Spurger questioned
Calloway about appellant being involved in the murder of the victim.  Calloway gave the officers a second consent
to search the residence and the Buick.








Detective
Spurger and Detective Tim Harshbarger went to meet with appellant again at the
hospital.  During this time, Dallas
police officers found the victim=s body.  Appellant gave a
written statement to Detective Spurger and Detective Harshbarger on August 9 at
about 6:00 p.m.  Detective Spurger read
the statement to the jury at trial.  In
his statement, appellant said that he met the victim at the victim=s mother=s house and that they went to the end of the street to load the
marihuana.  Appellant and the victim
then went to appellant=s
house and unloaded the marihuana. 
Appellant  went to the garage to
get the money, and the victim saw appellant=s pistol.  Appellant stated that
he and the victim fought over the gun and that appellant called for help from
his cousin, Keino Thomas. Thomas came in with a shotgun and held the shotgun to
the victim=s head. 
The victim tried to use appellant as a shield, and the victim hit the
shotgun in the air resulting in a struggle over the shotgun.  The victim Amomentarily got ahold of the gauge and tried to fire@ at appellant.  Thomas knocked the gun in the air as it went off, leaving a hole
in the ceiling.  Appellant then shot the
victim four times Abecause
I thought he had shot me.@  Appellant became paranoid and
told Thomas to Aget rid of [the victim=s] body.@  Thomas drove the victim=s vehicle and dumped the body.  In his statement, appellant stated that he
was supposed to pay the victim $93,375 for the marihuana.  Appellant gave his pistol to a friend,
Montreal Blair, and put the shotgun under his bed.  Detective Spurger testified that, after he had given his written
statement, appellant was considered to be under arrest for capital murder. 

After
taking appellant=s statement, Detective Spurger went to where
the victim=s body was found.  The body was found in the alley on the street where Thomas
lived.  Thomas gave a statement to the
police, and both appellant and Thomas were charged with capital murder.  After further investigation, Detective
Spurger met with appellant on August 13, and appellant gave another written
statement.   

Detective
Spurger read the August 13 statement to the jury.  In this statement, appellant again said that he met the victim
and that they went to appellant=s house to unload the marihuana. 
Appellant came in from the garage, and the victim said, A[H]ey, man, what=s going on.@  Appellant asked what the
victim was talking about.  The victim
said, A[T]his is what I=m talking about@; and the victim grabbed appellant and tried to get appellant=s gun from his back waistband.  Appellant called for Thomas to help him, and
Thomas came in with a shotgun.  The
victim grabbed Thomas, and the shotgun went off.  The victim used Thomas as a shield, and appellant fired his gun
three times.  Appellant said that he Ahit [the victim] in the head a few times@ and that A[h]e fell to the ground.@  Appellant stated that the
victim then got up and tried to use his car phone.  Appellant panicked and Ashot him the final time killing him.@  Appellant and Thomas dragged
the victim to the garage and put him in appellant=s car.  Appellant drove the
victim=s vehicle and abandoned it.  Appellant and Thomas put anything belonging
to the victim or anything with blood on it in a trash can in the backyard and
burned it.








Margaret
Medellin, the victim=s
wife, testified at trial that, on August 7, she last saw the victim at 6:30 or
7:00 p.m.  The victim called her at
11:25 p.m., but he did not say anything. 
Medellin could hear people in the background yelling and cursing, and
then they were disconnected.  Medellin
tried to call back but could not get through to the victim.  Medellin learned the following day that her
husband had been killed.

Arthur
DeCardenas with the Physical Evidence Section of the Dallas County Sheriff=s Office testified that he was called out to
appellant=s residence by the Balch Springs Police
Department to assist in their investigation. 
Officer DeCardenas found blood in the garage and in the trunk of the
Buick.  Officer DeCardenas took blood
samples from the garage and from the Buick; 
the DNA from those samples matched that of the victim.  Officer DeCardenas also testified that the
victim only had one tennis shoe when his body was found and that remnants of a
tennis shoe were found in the trash can at appellant=s residence. 

Calloway
testified at trial that she stayed at her aunt=s house on August 7 and that, on August 8, appellant and his friend
Blair came and picked her up.  Calloway
and appellant went to their home and were watching television when Thomas came
to the house in the Buick.  Calloway
noticed the bullet hole in the ceiling and blood on the carpet, but she did not
ask appellant about it until after they took Thomas home.  Calloway testified that appellant told her
that he and Thomas were involved in a Adrug deal@ and
that the Aguy got nervous...and picked up the shotgun.@ 
Appellant told Calloway that appellant=s gun hit the other gun and that it went off, creating the hole in the
ceiling.  Appellant then shot the
victim.  Appellant told Calloway that
Thomas dumped the body in Dallas.       Calloway said that early the next morning
she and appellant were in bed when she heard a knock at the door.  Calloway woke up appellant, and then she
looked out of the window.   Appellant
looked out of the window, and then shots were fired into the front of the
house.  Calloway called the police; and,
after they arrived, she gave them consent to search the house. 

Blair
testified at trial that, on the morning of August 8, appellant called Blair and
asked him to take appellant to church. 
Blair went and picked up appellant. 
Appellant was carrying a CD case. 
Blair and appellant went to Blair=s brother=s
house, and appellant asked Blair if he could leave the CD case at the
house.  Appellant told Blair that there
was a gun in the CD case.  Blair and
appellant went to church.  After church,
they picked up Calloway, and then Blair took appellant and Calloway home.  Blair said that, on August 9, the police
came to his mother=s
house and questioned him about the gun. 
Blair called his brother who brought the gun and gave it to the police. 








Appellant
testified at trial that he sold drugs for a living and that his older brother
was in prison for selling drugs. 
Appellant met the victim through appellant=s older brother.   Appellant=s cousin had a Aconnection@ that
wanted to buy some marihuana, and appellant arranged to buy the marihuana from
the victim.  Appellant had agreed to pay
the victim $93,375 for the marihuana, and he had received $120,000 from his
cousin=s Aconnection@ to
purchase the drugs.  Appellant met the
victim at the victim=s
mother=s house. 
They went to the end of the street to load the marihuana into the trunk
of appellant=s car. 
Appellant and the victim went to appellant=s house and unloaded the marihuana in the garage.  Appellant testified that he paid the victim
and then went back into the garage to close the garage door and the trunk of the
car.  When he went back into the house,
appellant had his pistol in the waistband of his pants.  While he was walking, the pistol began to
slip down into appellant=s pants.  Appellant was trying
to grab his pistol; and the victim, who was on the phone, saw appellant
reaching for the gun.   The victim asked
appellant, A[W]hat=s going on?@
Appellant responded, A[N]othing.@ 
Appellant said that the victim grabbed him and that the two began Atussling.@   Appellant testified that he
was pleading with the victim for his life and calling to his cousin, Thomas,
for help.  

Appellant
stated that Thomas came into the room with a shotgun and told the victim to let
go of appellant.  The victim pushed
appellant and grabbed the shotgun.   The
victim and Thomas were struggling over the gun, and it fired.  Appellant said that he then shot the victim
and also shot Thomas.  Appellant
testified that he knew the victim was dead. 
Appellant was scared, so they took the body and abandoned it.  Appellant then contacted the people who were
buying the marihuana from him and told them to come over.  When they arrived, appellant told them that
he had killed his supplier, and they requested their money back and left.

Appellant
testified that he tried to clean up the house and that he saw the victim=s shoe on the floor.  Appellant said that he burned the victim=s shoe and the towels he used to clean the
house.   Appellant said that he did not
have any intention of taking the victim=s property when he killed him. 
Appellant took the victim=s vehicle to Blair=s house, and he told Blair what had happened.  Blair told appellant to get rid of the vehicle.  Appellant and Blair took the victim=s vehicle and abandoned it with the keys in
the ignition.  Blair and appellant spent
the night at appellant=s
house.








            The
next morning, they took the pistol to Blair=s brother=s
house and then went to church. After church, Blair took appellant to get
Calloway, and appellant and Calloway went home. Appellant testified that, early
the next morning, someone shot through all of the front windows of his
house.  Appellant said that he was shot
in the leg and was taken to the hospital. 

Appellant
specifically argues that the evidence is insufficient to support his conviction
for murder because a rational trier of fact could not have found against him on
the issue of self-defense.  The State
has the burden of persuasion in disproving evidence of self‑defense.   Saxton v. State, 804 S.W.2d 910, 913
(Tex.Cr.App.1991).  The State is not
required to affirmatively produce evidence which refutes the self‑defense
claim; rather, the State has the burden to prove its case beyond a reasonable
doubt.  Saxton v. State, supra.    Self‑defense is subject to a factual
sufficiency challenge and review under the Clewis standard.  Shaw v. State, 995 S.W.2d 867, 868 (Tex.App.
- Waco 1999, no pet=n).   In our review for factual sufficiency of
the evidence, we consider all the evidence in the record related to the
contested issue.  Shaw v. State, supra.   We reverse the conviction only if the jury=s rejection of the defendant=s evidence of self‑defense is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  Shaw v. State, supra.  

 Appellant testified at trial that he was
afraid for his life when Thomas and the victim were struggling over the shotgun
and the gun fired.  The State presented
evidence that appellant and his cousin were both armed during the drug
transaction and that the victim did not fire a weapon during the altercation.  The jury heard evidence that the victim was
using Thomas as a shield when he was shot. 
The jury is the sole judge of the credibility of the witnesses and the
weight to be given their testimony. 
TEX. CODE CRIM. PRO. ANN. arts. 36.13 & 38.04 (Vernon 1979 and
1981).  The jury views the demeanor of
the witnesses and can choose to believe all, some, or none of the
testimony.  Chambers v. State, 805
S.W.2d 459 (Tex.Cr.App.1991). Viewing all of the evidence, we do not find that
the jury=s verdict of guilty and its rejection of
appellant=s claim of self-defense are so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust.  Clewis v. State, supra.  Appellant=s fourth point of error is overruled.








In his
first point of error, appellant contends that the State made an impermissible
jury argument.  In his second point of
error, appellant argues that the trial court erred in denying him the right to
reopen his case for additional testimony after the State=s impermissible jury argument.  At trial, appellant testified that, after he
gave his second statement, Detective Harshbarger accused him of lying.  Appellant said that Detective Harshbarger
told him that he had a witness named AJorge@ who had seen appellant with the victim and
who would prove that appellant lied about the events that occurred.  Detective Harshbarger also said that he had
witnesses who heard appellant arguing with the victim on the phone.  Appellant testified that he gave a third
statement because Detective Harshbarger accused him of lying and said that he
had witnesses to prove appellant was lying. 

Appellant
called Detective Harshbarger to testify, and the State informed the trial court
that he was Aunavailable at this time.@ 
Appellant and the State agreed to a stipulation regarding Detective
Harshbarger.  The following stipulation
was read to the jury:

It is
hereby stipulated and agreed by the State and the Defense that Detective
Harshbarger has never met nor interviewed the witness mentioned earlier, who
has come to be known as Jorge, concerning any matter in relation to this case.

 

The State
made the following statement regarding Detective Harshbarger during its closing
argument:

Let me
respond to some things he said about the detectives.  I did not call Detective Harshbarger.  They had a very limited role in this case.  Dallas discovered the body, notified the
next of kin, found the [victim=s vehicle]. The next day they came and talked to [appellant] just as a
marihuana investigation for five minutes. 
That=s all Harshbarger had to do with this
case.  And that=s why I didn=t call him.  

 

Now,
[appellant=s counsel] goes up and down about Jorge.  Jorge is not relevant to anything here.  The stipulation was that Harshbarger never
interviewed him.  Not that he never
talked to him.  

 

Appellant objected to the
argument; and the trial court instructed the jury, AYou hear the argument ladies and gentlemen,
you will be bound [by] jury argument.@  Appellant requested to reopen
his case and also requested a mistrial which were both denied.  

We find
that the State=s argument is in response to the argument of
appellant=s trial counsel that the State did not call
Detective Harshbarger because Athey got a problem with Harshbarger=s testimony.@  See Coble v. State, 871 S.W.2d 192
(Tex.Cr.App.1993).  Appellant argues
that the argument misstates the stipulation. 
Although the State=s argument does not precisely follow the stipulation, the entire
stipulation was read to the jury.  We
find that any misstatement did not affect appellant=s substantial rights.  TEX.R.APP.P. 44.2(b).  








The
decision to reopen a case is left to the sound discretion of the trial
court.   Cain v. State, 666 S.W.2d 109,
111 (Tex.Cr.App.1984).   The trial court
abuses its discretion if it refuses to reopen a case when the following
conditions are met:  (1) the witness was
present and ready to testify; (2) the request to reopen was made before the
charge was read to the jury and final arguments were made; (3) the court had
some indication of what the testimony would have been and was satisfied that
the testimony was material and bore directly on the main issues in the
case;  and (4) there was no showing that
introduction of the testimony would have impeded the trial or interfered with
the orderly administration of justice.  
Sims v. State, 833 S.W.2d 281, 286 (Tex.App. ‑ Houston [14th
Dist.] 1992, pet=n ref'd). 
Appellant has not shown that the trial court abused its discretion in
refusing to allow him to reopen his case. 
Appellant=s first and second points of error are
overruled.  

In his
third point of error, appellant argues that the State failed to reveal
favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 87
(1963).  The Supreme Court held in Brady
that the prosecution violates due process when it suppresses evidence in its
possession favorable to an accused "where the evidence is material either
to guilt or to punishment, irrespective of the good faith or bad faith of the
prosecution."    Wyatt v. State, 23
S.W.3d 18 (Tex.Cr.App.2000).  Evidence
withheld by a prosecutor is "material" if there is "a reasonable
probability that, had the evidence been disclosed to the defense, the outcome
of the proceeding would have been different."  Wyatt v. State, supra at 27.  
A "reasonable probability" is a "probability sufficient
to undermine confidence in the outcome." Wyatt v. State, supra at 27.   Thus, a due process violation has occurred
if a prosecutor (1) fails to disclose evidence (2) favorable to the accused (3)
which creates a probability of a different outcome. Wyatt v. State, supra.  

Appellant
contends that Detective Harshbarger lied to him and that the State was aware of
Detective Harshbarger=s
actions because of the agreed stipulation and because of the fact that
Detective Harshbarger was unavailable to testify.  Detective Spurger testified that, to his knowledge, Detective  Harshbarger never lied to appellant.  Appellant has not presented any evidence
that the State failed to disclose evidence favorable to him.  Moreover, appellant testified at trial that
Detective Harshbarger lied to him; therefore, appellant has not shown that the
State withheld evidence which would have resulted in a different outcome.  Appellant=s third point of error is overruled.

 








The
judgment of the trial court is affirmed.

 

JIM
R. WRIGHT

September 26, 2002                                                                 JUSTICE

Do not publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.